**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

LECTROLARM CUSTOM SERVICES,    )
INC.,                          )
                               )
    Plaintiff,             )
                               )
v.                             )          No. 03-2330 Ma/A
                               )
VICON INDUSTRIES, INC.,        )
et al.,                        )
                               )
    Defendants.            )
_____

**ORDER DENYING DEFENDANT SENSORMATIC'S MOTION FOR SUMMARY JUDGMENT**
**OF INVALIDITY OF CLAIMS 1-5**
_____

Before the court is Defendant Sensormatic Electronics Corp.'s ("Sensormatic") motion for summary judgment of invalidity of patent claims 1-5, filed on September 24, 2004. Plaintiff Lectrolarm Custom Services, Inc. ("Lectrolarm") filed a response on December 17, 2004. On September 2, 2005, the court filed its Memorandum Opinion and Order on <u>Markman</u> Motion ("Markman Order"). In response to the court's claim construction, Sensormatic filed a memorandum in further support of its motion for summary judgment on October 14, 2005. Lectrolarm filed a response on November 14, 2005. Sensormatic filed a reply on November 30, 2005. For the following reasons, summary judgment of invalidity of claims 1-5 is DENIED.

## I. Background

On May 12, 1989, a patent for a remote control apparatus for a rotating camera base was filed with the United States Patent and Trademark Office ("PTO"). The PTO issued U.S. Patent No. 4,974,088 (the "'088 patent") to inventor Takeshi Sasaki on November 27, 1990. The technology at issue is an apparatus that uses computer memory and digital communication to allow remote control "rotation of a monitoring television camera in the horizontal and vertical directions." U.S. Patent No. 4,974,088, Column 1:6-8. The patent was originally assigned to Maruwa Electronic & Chemical Company ("Maruwa"). Maruwa assigned the patent to Lectrolarm. Lectrolarm alleges that the Defendants have infringed the '088 patent.[1]

## II. Standard for Summary Judgment of Invalidity

The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). The moving party can meet this burden by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case.

---

[1]Originally there were 14 defendants; four remain.

See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.
1989).

     When confronted with a properly supported motion for summary
judgment, the nonmoving party must set forth specific facts
showing that there is a genuine issue for trial. A genuine issue
for trial exists if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party. See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party opposing
the motion must "do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
The nonmoving party may not oppose a properly supported summary
judgment motion by mere reliance on the pleadings. See Celotex
Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the
nonmoving party must present "concrete evidence supporting its
claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d
934, 937 (6th Cir. 1989). The district court does not have the
duty to search the record for such evidence. See InterRoyal Corp.
v. Sponseller, 889 F.2d 108, 110-11 (6th Cir. 1989). Nonmovants
have the duty to point out specific evidence in the record that
would be sufficient to justify a jury decision in their favor.
See id.

     "A patent is presumed to be valid and this presumption only
can be overcome by clear and convincing evidence to the
contrary."  Helifix Ltd. v. Blok-Lok Ltd., 208 F.3d 1339, 1346
(Fed. Cir. 2000)(internal citation omitted). Therefore, in

addition to showing that there is no genuine issue of material fact, the movant must present clear and convincing evidence that the claims in the '088 patent at issue were anticipated by a prior invention that meets the requirements of 35 U.S.C. § 102(b) to be entitled to summary judgment of patent invalidity. <u>See</u> <u>Helifix</u>, 208 F.3d at 1346.

**III. Analysis**

Sensormatic alleges that claims 1-5 of the '088 patent are invalid under 35 U.S.C. § 102(b) because those claims were anticipated by products sold by Sensormatic before May 12, 1988, as part of its SensorVision line. Specifically, Sensormatic's motion refers to two systems: (1) an RC20PG controller with an RA412C programmable dome, and (2) an RC20PG controller with an RA444S programmable mini-dome. (Pl.'s Mem. Opp'n Summ. J. 6.)

**A. On Sale Bar**

For a patent to be invalid under the on sale bar of the Patent Code, the invention claimed in the patent must have been "on sale in this country more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Because the application for the '088 patent was filed on May 12, 1989, the critical date for purposes of the on sale bar is May 12, 1988.

Two conditions must be satisfied for the on sale bar to apply. First, there must be a "commercial offer for sale" of the product. <u>Pfaff v. Wells Electronics, Inc.</u>, 525 U.S. 55, 67 (1998). Second, the invention must have been ready for patenting

before the critical date, which can be shown by proof of reduction to practice or by proof that sufficiently specific drawings or other descriptions of the invention had been made such that a person skilled in the art could construct the invention. Id. at 67-68. The evidence, taken in the light most favorable to Lectrolarm, shows that one of the two SensorVision systems, the RC20PG controller with an RA412C programmable dome ("SensorVision dome"), satisfies both elements of the on sale bar.

Sensormatic has produced order forms showing that Montgomery Ward placed orders for both RC20PG controllers and RA412C programmable domes for several of its stores on November 25, 1987. (Def.'s Mem. Supp. Summ. J. Ex. K.) The evidence further shows that this was a commercial sale rather than an experimental use. (Id. Ex. I.) Second, the information in the 1986 "SensorVision Programmable Systems Technical Service Manual" ("'86 manual") provides sufficiently specific drawings or other descriptions of both the RC20PG controller and the RA412C programmable dome to satisfy the second element of the on sale bar. (Id. Ex. C at 5-61 to 73, G-6, G-12.)

Lectrolarm argues that the '86 manual cannot be used to show that the SensorVision dome was prior art under 35 U.S.C. § 102(b) because it was not publicly available, but only an internal service manual. This argument is unavailing, however, because Sensormatic's claim for invalidity is based on the on sale bar of the Patent Code, not the printed publication bar. The '86 manual

is relevant, not because it was publicly available, but because
it provides detailed information about the design and functions
of the SensorVision dome. See Pfaff, 525 U.S. at 68 (finding that
drawings of an invention that were sent *only* to the manufacturer
before the critical date were sufficient to show that the
invention was ready for patenting).

> Lectrolarm further notes that the '86 manual states,
>
> The information contained in this manual is
> preliminary. Major restructuring of, and additions to,
> the product line are expected in the near future. In
> particular, the manual refers to the RR532...and
> RU501...even though these products are not yet released
> and complete information is unavailable.

(Def.'s Mem. Supp. Ex. C at 1-1.) Lectrolarm argues that this
statement indicates that the manual is not a reliable source for
determining the design and capabilities of the SensorVision dome.
This introductory information, however, does not mean that
information on the RA412C programmable dome or RC20PG controller
is inaccurate.

It does appear, however, that the capabilities of the
SensorVision dome had expanded beyond those described in the '86
manual by 1988.  The '86 manual does not discuss the sequence
feature described in the 1988 SensorVision Owners Manual ("Owners
Manual"). (Id. Ex. E at 13.)  Capabilities described in the
Owners Manual cannot be considered by the court in its analysis
of claim invalidity because, given only a copyright year of 1988,
the court has insufficient information to determine whether the
Owners Manual was published before or after May 12, 1988.  That

additional functions may have been added to the SensorVision dome
after the publication of the '86 Manual does not, however, make
the information in the '86 Manual unreliable as a source for
determining the design and capabilities of the SensorVision dome
before May 12, 1988. Therefore, the court finds that the
SensorVision dome, as described in the '86 Manual, meets the
requirements of the on sale bar.

**B. Identity**

To invalidate a patent claim, the prior invention offered
for sale must "be something within the scope of the claim."
<u>Scaltech Inc. v. Retec/Tetra, L.L.C.</u>, 178 F.3d 1378, 1383 (Fed.
Cir. 1999). To be within the scope of the claim, the invention
must meet all of the limitations of the claim. <u>Id.</u> The five
claims that Sensormatic maintains are invalidated by the
SensorVision dome provide as follows, with the limitations that
Lectrolarm contends the SensorVision dome does not meet
underlined:

> 1. A remote control apparatus for a rotating camera
> base that supports a television camera such that it is
> rotatable in the horizontal and vertical directions,
> said remote control apparatus for a rotating camera
> comprising:
>
>> a first controlling means that outputs a
>> digital signal for driving and controlling
>> said rotating camera base,
>>
>> a <u>modem</u> for receiving and transmitting said
>> digital signal outputted from said first
>> controlling means for driving and controlling
>> said rotating camera base, said modem
>> including a modulating circuit and a
>> demodulating circuit;

a control box including said modulating circuit <u>that outputs the modulated version of the digital signal from said first controlling means with a prescribed carrier wave</u>, said modulating circuit being electrically connected to said first controlling means,

said demodulating circuit that recovers the digital signal from the modulated input from said modulating circuit being provided in said rotating camera base and electrically connected to said modulating circuit, and

a second controlling means that drives and controls said rotating camera base based on the digital signal from said demodulating circuit, said second controlling means being electrically connected to said demodulating circuit of said modem.

2. A remote control apparatus for a rotating camera base that supports a television camera such that it is rotatable in the horizontal and vertical directions, said remote control apparatus for a rotating base comprising:

<u>an input means for inputting the operating data for the automatic operation of said rotating camera base</u>,

a storing means electrically connected to said input means for storing the operating data inputted by means of said input means, said storing means including a random access memory, and

a controlling means that controls the automatic operation of the rotating camera base based on previously stored operating data stored in said storing means, said controlling means being electrically connected to said storing means

<u>whereby operating data previously stored in said storing means is employed to automatically operate the rotating camera base in accordance with said previously stored operating data</u>.

3. A remote control apparatus for a rotating camera base, <u>as set forth in claim 2</u>, wherein

said input means further includes a second input means for inputting the home position data used for making said rotating camera base rotate to prescribed home positions during automatic operation,

said storing means further stores the home position data inputted by means of aid [sic] second input means,

an instructing means is further provided for inputting to said controlling means the instruction signals for making said rotating camera base rotate to prescribed home positions during automatic operation, said instructing means being electrically connected to said controlling means,

said controlling means further makes said rotating camera base rotate to a prescribed home position during automatic operation according to the instruction signals from said instructing means, based on said home position data stored in said storing means.

4. A remote control apparatus for a rotating camera base, <u>as set forth in claim 2</u>, wherein

said input means further includes a second input means for inputting the home position data used for making said rotating camera base rotate to prescribed home positions during automatic operation,

said storing means further stores the home position data inputted by means of said second input means,

external sensors that send an emergency signal to said controlling means are provided in said prescribed home positions and are electrically connected to said controlling means, and

said controlling means further makes said rotating camera base rotate to a prescribed home position based on the emergency signal sent from the external sensor and on said home position data stored in said storing means.

5. A remote control apparatus for a rotating camera base, <u>as set forth in claim 4</u>, that is further provided with

> a disabling means that prevents, based on the emergency signal from said external sensors, said controlling means from making said rotating camera base rotate to a prescribed home position, said disabling means being electrically connected to said external sensor, and
>
> <u>a display means that shows the presence or absence of said emergency signal, said display means being electrically connected to said external sensor</u>.

U.S. Patent No. 4,974,088, Column 10:10-11:41. All claims will be construed in accordance with the meanings provided in the <u>Markman</u> Order.

### 1. Claim 1

There is a genuine issue of material fact about whether the Sensormatic dome used a modem. In its <u>Markman</u> Order, the court defined a modem as "a device that modulates digital information onto a carrier wave and demodulates the signal to recover the digital information from the modulated carrier wave." (Markman Order 51.) The court further found that "'modulation onto a carrier wave' includes encoding digital data onto a pulse waveform in a format such as non-return to zero, return to zero, Manchester, or bi-phase." (Markman Order 24).

Sensormatic asserts that Lectrolarm's own expert, Dr. Bernard Sklar, acknowledged that the communication system used in the Sensormatic dome, which uses a non-return-to-zero format, would require modulation of digital information onto a carrier wave if the system involved transmission of electrical information over a cable to a camera in another room. (Sklar Dep.

90:16-91:25, Jan. 22, 2005.) Sensormatic's Rule 30(b)(6) witness
about the SensorVision system, Robert Paff, who was one of the
designers of the system, stated, however, that the system was *not*
designed to modulate the signal or to use a carrier wave. (Paff
Dep. 197:9-198:3, May 11, 2004.)

That a non-return to zero pulse code like that used in the
SensorVision system *could* constitute modulation onto a carrier
wave does not necessarily mean that it does meet that claim
limitation, particularly when one of the system's designers has
said that it does not. This evidence establishes a genuine issue
of material fact about whether the SensorVision dome modulated
digital information onto a carrier wave, as would be required to
meet the definition of modem in the Markman Order. Furthermore,
given the high showing required to invalidate a patent, the court
finds that Sensormatic has not produced clear and convincing
evidence that claim 1 of the '088 patent was anticipated by the
SensorVision dome. Defendant Sensormatic's motion for summary
judgment of invalidity of claim 1 is, therefore, denied.

### 2. Claim 2-5

As to claims 2, 3, 4, and 5, the parties contest whether the
SensorVision dome has the required input means and whether it
could perform automatic operations with the required operating
data. The Markman Order defines the structure of the input means
as "the control pad and a set of buttons and switches (including
switches for inputting pan and tilt speeds, the interval scan
switch, the memory set and clear buttons, and switches for

11

setting the particular mode of automatic operation) on the operating panel." (Markman Order 26.) The court has found that automatic operation is "movement of the camera base that is not directly responsive to input from a monitoring person (other than initiation of the automatic operation)." (Id. 52.) Operating data is defined as "data that controls the automatic operation of the camera base, and that is set through use of the structure of the input means." (Id.)

### a. Input Means

In its response to Sensormatic's Memorandum in Further Support of its motion, Lectrolarm asserts that the SensorVision dome cannot be found to anticipate claims 2 through 5 because it does not include an interval scan switch, relying on the court's inclusion of the interval scan switch in the list of buttons and switches in its definition of the structure of the input means. Before the court issued its Markman Order, Lectrolarm proposed a definition of operating data that includes the language, "[T]he operating data must include at least position data...and stopping interval data. Operating data may also include data specifying speed of rotation, pan and tilt at the discretion of the user..." (Id. 30.) The court, however, found no basis in the patent for including this language. (Id.) Given the court's finding that the operating data need not include stopping interval data, it would be contradictory for the inclusion of the interval scan switch in the definition of the structure of the input means to be read as

a requirement rather than an example of the buttons and switches
that could be included as part of the input means.  Therefore,
the fact that the SensorVision dome did not include an interval
scan switch does not necessarily mean that it could not have
anticipated claims 2 through 5 of the '088 patent.

### b. Automatic Operation

Sensormatic asserts that the target, pattern, and sequence
features of the SensorVision dome anticipate claims 2 through 5
of the '088 patent. Because the earliest mention of the sequence
feature occurs in the Owners Manual, which has a copyright date
of 1988, there is no clear evidence that SensorVision domes
included the sequence feature before the critical date of May 12,
1988. Therefore, the court will consider only Sensormatic's
claims as to the SensorVision dome's target and pattern features.

The target feature of the SensorVision dome allows the
operator to move the camera to a pre-defined position in response
to a command from the console. (Def.'s Mem. Supp. Ex. C at 2-19.)
The pattern feature of the SensorVision dome allows the operator
to store a number of camera positions, along with time stamps, to
create a pattern of camera movements that the system can later
duplicate on command. (Id. at 2-19 to 2-20.) Lectrolarm asserts
that neither of these features meets the definition of automatic
operation because neither involves rectilinear motion between
preset points or automatic movement to a preset point when an

alarm is triggered, the two types of automatic operation
described in the specification of the '088 patent. U.S. Patent
No. 4,974,088, Column 5:57-61, 6:28-41.

In its <u>Markman</u> Order, the court relied on the two types of
automatic operation described in the specification to define
"automatic operation" and "operating data." (Markman Order
27-29.)  Sensormatic asserts, however, that examples of automatic
operation included in the patent specification cannot be used to
limit the claims to include only those types of automatic
operation.  The Federal Circuit has warned against limiting
claims to embodiments described in patent specifications.
<u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1323 (Fed. Cir. 2005).  The
Federal Circuit has also instructed courts, however, about the
importance of recognizing the difference between an embodiment
that is meant to be merely an example to instruct others on the
best way to make and use an invention and an embodiment that is
meant to be coextensive with the patent claims. <u>Id.</u>

In the context of the '088 patent, the modes of automatic
operation described in the specification were meant to be
coextensive with the term "automatic operation" as it is used in
claims 2 through 5, which the court recognized in its <u>Markman</u>
Order by defining "automatic operation" and "operating data"
according to the features and limitations of the modes described
in the patent specification.  Therefore, because the target and

14

pattern features of the SensorVision dome do not constitute either of the modes of automatic operation described in the patent specification, they do not involve automatic operation, as defined in the <u>Markman</u> Order, and Defendant Sensormatic's motion for summary judgment of invalidity of claims 2 through 5 is denied.

## IV. Conclusion

Defendant Sensormatic Electronics Corp.'s motion for summary judgment of invalidity of patent claims 1-5 is DENIED.

So ordered this 6th day of February 2006.

s/Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

15